UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

RICHARD HAWLEY,

         Plaintiff,

    v.

LIFE INSURANCE COMPANY OF
NORTH AMERICA,

         Defendant.

_____/

NO. CIV. 08-079 FCD/KJM

MEMORANDUM AND ORDER

----oo0oo----

This matter is before the court on the parties' cross-motions for judgment on the administrative record, pursuant to Federal Rule of Civil Procedure 52, arising out of defendant Life Insurance Company of North America's ("defendant" or "LICNA") termination of plaintiff Richard Hawley's ("plaintiff") long-term disability ("LTD") benefits.[1]

---

[1] Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs.  E.D. Cal. L.R. 78-230(h).

1

For the reasons set forth below, the court finds that the proper standard of review is de novo, and thereunder, the court finds that plaintiff has not met his burden to show that he is totally disabled from engaging in "any occupation" as defined in the subject policy.  As such, the court DENIES plaintiff's motion for judgment in his favor and HEREBY GRANTS judgment in favor of defendant.

### BACKGROUND[2]

#### A.   **Policy Provisions**

Plaintiff, as an employee of Tandem Computers ("Tandem"), was a participant in Tandem's Group Long Term Disability Plan[3] insured by LICNA.  (Compl., filed Jan. 11, 2008, ¶s 3-10.)  The policy issued by LICNA to Tandem defined total disability for the first two years with reference to an employee's "own occupation." The policy provides:  "An Employee will be considered Disabled if because of Injury or Sickness:  1. he is unable to perform all the material duties of his regular occupation . . . ."  (AR 5.) It is undisputed that plaintiff received benefits under that provision of the policy for two years.  "After Monthly Benefits have been payable for 24 months," the policy provides that an

---

[2]     The factual background is derived from the administrative record.  The parties stipulated to what that record contains.  (Docket #23, indicating that the administrative record is contained in two volumes, "Volume I" containing documents bates stamped LINA 000001-000807 and "Volume II" containing documents bates stamped LINA 000808-001617.)  All citations herein will be to the applicable page(s) of the administrative record, designated "AR -" (the court omits the preceding zeros in the bates stamped numbering).

[3]     The parties agree this Plan is an employee welfare benefit plan organized and operating under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.

employee is considered totally disabled if he is "unable to perform all the material duties of any occupation for which he is or may reasonably become qualified based on his education, training, and experience" (hereinafter referred to as the "any occupation" standard or provision).  (Id.)

### B.   Initial Claim/Grant of Benefits

At the time of the subject accident which gave rise to plaintiff's disability claim, plaintiff was employed by Tandem as a Project Design Engineer.  (AR 1008, 1138.)  Previously, plaintiff obtained an electrical engineering degree from San Jose State.  (Id.)  He was a Data Systems Technician in the Navy from January 1977 to December 1980.  (AR 1578.)  Thereafter, he was an Engineer/Analyst for Sperry Univac from December 1980 through November 1983 and held a Senior Technical position at Daisy Systems from November 1983 to October 1986.  (Id.)  He began working for Tandem in October 1986 as a design engineer.  (Id.)

The Department of Labor's occupational description for a "Design Engineer" states that such an occupation is driven by intellect, not physical capabilities.  (AR 1012-14.)  It involves conducting analytical studies, analyzing data, research, developing plans, analyzing systems, and numerous other job duties that are not physical in nature.  (Id.)  Tandem's job description for plaintiff's position is in accord, indicating that plaintiff's position involved virtually no physical requirements.  (AR 1595.)  According to Tandem, plaintiff's position involved "[e]valuation and testing of vender supplied software and work stations."  (Id.)  It required 95% sitting, 3% stooping, and 2% walking; the only physical activity identified

3

1  is carrying 3 pound manuals, documents and tapes occasionally.

2  (Id.)

3       On August 21, 1990, plaintiff was in a motor vehicle

4  accident.  (AR 1568.)  On February 26, 1991, plaintiff was

5  diagnosed with Reflex Sympathic Dystrophy ("RSD") by Dr. Amy

6  Ladd, a condition in which plaintiff suffers severe pain and a

7  burning sensation in his left upper extremity.  (AR 1584-88.)

8  Plaintiff applied for LTD beneifts on April 9, 1991.  (AR 1606-

9  09.)  Dr. Vivek Pai ("Pai"), a neurologist and plaintiff's

10  primary treating physician, submitted a report, dated June 6,

11  1991, in which he concluded plaintiff was totally disabled based

12  on RSD, effecting his left upper extremity, and due to chronic

13  pain therefrom.  (AR 1560-61.)  LICNA awarded plaintiff LTD

14  benefits on June 24, 1991.  (AR 1556-57.)  Thereafter, on

15  November 23, 1991, Dr. Michael Rowbotham of the UCSF Pain

16  Management Center provided an additional opinion, concluding that

17  plaintiff was totally disabled based on RSD.

18       In February 1993, at LICNA's request, Dr. Allen Bott

19  ("Bott") performed an independent medical examination ("IME") on

20  plaintiff.  Dr. Bott concurred with the diagnosis of RSD, placing

21  plaintiff in Stage II of the disease, but concluded that

22  plaintiff "should be able to return to work full-time in the near

23  future, particularly after his depression improves with

24  appropriate anti-depressant medication therapy."  (AR 1495.)  Dr.

25  Bott stated that while plaintiff cannot use his left upper

26  extremity due to the RSD, he can still use his mind, his lower

27  extremities and his upper right extremity.  (Id.)  He specified

28  that plaintiff's future employers will need to accommodate

4

1   breaks.  (Id.)

2       Despite Dr. Bott's conclusions, on August 22, 1993, LICNA

3   concluded that plaintiff was entitled to LTD benefits under the

4   "any occupation" provision of the policy.  (AR 1466.)

5       **C.   Interim Claims Processing**

6       Over the years leading to LICNA's decision in 2007 to

7   terminate plaintiff's benefits, defendant's handling of

8   plaintiff's claim was largely routine.  Dr. Pai provided numerous

9   interim standardized form reports (including Attending Physician

10  Statements ["APS"], Physical Capacities Forms ["PCF"], Physical

11  Ability Assessments ["PAA"], letters and progress notes)

12  regarding plaintiff's condition, covering the period of March

13  1991 to June 2006.  (AR 1609 [APS], 1570-71 [Ltr.], 1560-61

14  [Ltr.], 1551 [PCF], 1552-1553 [APS], 1539 [PCF], 1534-35 [APS],

15  1533 [PCF], 1522 [PCF], 1512 [PCF], 1478-79 [APS], 1445 [APS],

16  1594 [APS], 1358-59 [APS], 1360 [PCF], 1297-1300 [APS], 1293-94

17  [APS], 1271-72 [APS], 1018-19 [PAA], 1232-33 [APS], 1205-06

18  [Ltr.], 1022 [Note], 1006-09 [APS], 1027-28 [Note], 1114-17

19  [APS], 955 [Note], 1082-83 [PAA], 959-60 [APS].)  In each of

20  these reports, Dr. Pai indicated that plaintiff's condition

21  remained unchanged, and that he continues to suffer from RSD and

22  chronic pain syndrome, which preclude him from working in any

23  capacity.  (Id.)

24      Plaintiff described his condition similarly over the years.

25  Near the time of his initial diagnosis, plaintiff described that

26  the pain on his left side is so severe that even air blowing over

27  his left hand and arm causes a very uncomfortable sensation, and

28  that his left hand cannot be moved or even straightened.  (AR

5

1030.)  In June 1999, plaintiff informed defendant that he could
not attend a functional capacity evaluation because his left arm
has a burning pain continuously.  (AR 1236.)  He stated that he
hits people if they touch his left arm.  (Id.)  Plaintiff also
complained of depression from not being able to have a normal
life.  (AR 1130-33.)  He explained that his concentration and
memory is "awful due to chronic pain" and that his sleeping
pattern is "very irregular."  (AR 965-970.)  Thereafter, on Daily
Activity questionnaires, from 2003-2005, plaintiff described his
limitations and restrictions in an identical manner.  (AR 1190-
92, 965-70, 1087-92.)  He stated that he has "constant chronic
burning pain . . . [which] radiates through [his] left shoulder
down through my left hand."  (AR 1190, 966, 1087.)  He stated
that he cannot "concentrate or focus and become[s] frustrated and
irritated and upset."  (Id.)  As for his activities during these
years, plaintiff stated that he never uses a computer, and that
he is only able to read or watch TV for 1 to 2 hours daily.
(Id.)  He stated he only drives in an "emergency."  (AR 1190,
969, 1087.)  He indicated that he walks daily "around [the]
house" for 10 to 15 minutes.  (AR 1191, 969, 1087.)  He stated
that while he does some physical therapy daily "with sponge balls
in movement to stop atrophy of [his] left limb," his wife has to
help him with all his personal needs.  (AR 1191, 966, 969, 1087,
1091.)  He asserted his limitations are so severe, that even
though he is right handed, his wife had to help him fill out the
questionnaires.  (AR 965, 1088.)

     During this period, while he was receiving LTD benefits from
defendant, plaintiff applied for Social Security Disability

6

Insurance ("SSDI") benefits as well.  His application was denied
in July 1991.  (AR 1549.)  In December 1993, defendant hired an
attorney to represent plaintiff in his appeal of the denial of
his SSDI benefits.  (AR 1314.)  Ultimately, plaintiff prevailed
and was awarded SSDI benefits on January 31, 1994.  (AR 1310.)
The Social Security Administration ("SSA") found that plaintiff
suffers from RSD and other related conditions and is incapable of
performing his past relevant work or any other work.  (AR 1310-
13.)  Based on the SSDI award, defendant reduced plaintiff's LTD
benefits and demanded and received repayment from SSA of
$77,186.90 for overpaid benefits.  (AR 1303-06, 1329-32, 1343-
44.)  Plaintiff continued to receive SSDI benefits at the time
defendant terminated his LTD benefits in February 2007.  (Pl.'s
Trial Brief, filed Feb. 17, 2009, at 5, ¶s 25-28.)

    D.    **LICNA's Investigation Leading to the Termination of
        Plaintiff's LTD Benefits**

On May 17, 2005, plaintiff's file was referred to LICNA's
Special Investigation Unit ("SIU") on the basis that
(1) plaintiff did not wish to complete an FCE; (2) it was
difficult to acquire medical information from plaintiff's doctor;
and (3) plaintiff complained of severe pain but only saw his
doctor once a year.  (AR 963, 1086).[4]  SIU accepted the file on
October 4, 2005.  (AR 1085.)  As part of its investigation, in

---

[4]      Plaintiff argues under defendant's own regulations (AR
593-606), there were no grounds to refer his file to the SIU.
(Pl.'s Trial Brief at 8-9.)  However, whether defendant properly
investigated plaintiff's claim is not relevant to the inquiry at
hand.  As set forth below, under de novo review, defendant's
claims handling procedures are not relevant; the only issue is
whether plaintiff has met his burden to show, by a preponderance
of the evidence, that he is totally disabled within the terms of
the policy.

1   November 2005, plaintiff was placed under surveillance by
2   defendant.  (AR 1067.)  The video surveillance, submitted as part
3   of the administrative record, shows plaintiff at 9:24 a.m. on
4   November 7, 2005, leaving his house and walking in his
5   neighborhood.  (<u>Id.</u>)  He is carrying a water bottle in his right
6   hand and is moving his left arm freely.  (<u>Id.</u>)  The surveillance
7   report indicates that plaintiff arrived back home from his walk
8   at 10:55 a.m.  (<u>Id.</u>)[5]  The investigator drove the route plaintiff
9   walked and estimated the distance as roughly 5 miles.  (<u>Id.</u>)
10  Again, on November 9, 2005, plaintiff is seen on the videotape
11  leaving his residence to go for a walk at 9:30 a.m., carrying a
12  water bottle in his right hand; the surveillance report indicates
13  plaintiff returned home at 11:00 a.m.  (<u>Id.</u>)  Plaintiff also went
14  for a shorter walk on November 10, 2005.  (<u>Id.</u>)

15       Plaintiff is also seen on the videotape, on November 7, 2005
16  at 9:24 a.m., using his left hand to reach into his front shirt
17  pocket.  (<u>Id.</u>; Ex. D to Def.'s Trial Brief, filed Feb. 12, 2009.)
18  His movement is voluntary and without hesitation.  That same day
19  at 10:54 a.m., plaintiff, again voluntarily and without
20  hesitation, uses his left hand and arm to open a garbage can lid.
21  (<u>Id.</u>; Ex. C to Def.'s Trial Brief.)

22       Finally, on November 8, 2005, defendant's investigator
23  observed plaintiff departing the area of his residence driving a
24  black four door BMW at 11:43 a.m.  (AR 1069.)  He drove to a gas

25

26       [5]   Due to the open, rural area in which plaintiff walked,
     it was difficult to tape his entire walk without the investigator
27   being detected.  Therefore, the investigator did not videotape
     plaintiff's entire walk but noted in his report the time
28   plaintiff left his house and the time he returned.

station where his wife got out of the car and went into the store
for a brief period.  Plaintiff returned home, driving the car, at
12:00 p.m.  (Id.)

Also, as part of its investigation of plaintiff's file,
defendant sent plaintiff for a functional capacity evaluation
("FCE") on August 23 and 24, 2006, by physical therapist, Stacey
Pittman ("Pittman").  (AR 944-58.)  Pittman observed plaintiff
arriving at her clinic; she states that plaintiff's wife drove,
and that plaintiff had difficulty getting out of the car and had
difficulty walking 105 feet from the car to the clinic.  (AR
953.)  She states plaintiff: "began to walk very slowly towards
the clinic.  His left arm was hanging at his side.  His gait
appeared shuffled with wide base of support.  There was a curb
prior to entering the clinic.  Plaintiff paused briefly before
lifting his leg to step up the curb."  (Id.)  Pittman describes
plaintiff's "Chief Complaints/Symptoms" as follows:  Plaintiff
has "burning pain in left upper extremity, most painful in left
shoulder joint and left hand, very hypersensitive to touch,
unable to tolerate any superficial touch, or even air blowing on
arm . . . any movement of left shoulder, elbow, or hand increases
pain symptoms.  Can move fingers slightly but even this movement
increases pain."  (AR 944.)  Pittman also describes plaintiff's
functional limitations as he reported them to her:  Plaintiff
states he has to sleep in a recliner; his wife has to help him
pull his zipper up and down and pull his pants up and down to go
to the restroom; she has to wipe him; he cannot take a shower
because he cannot tolerate the water hitting his arm; he stands
in the bathtub while his wife washes him; his wife has to dress

9

him and shave him; he tries to read but his medicine makes it difficult for him concentrate; he can walk around his house for limited periods; he states he only drives in emergencies.  (<u>Id.</u>)

Ultimately, Pittman did not reach any conclusions about plaintiff's physical condition because plaintiff "became extremely anxious and irritated" and was "uncooperative."  In large part, plaintiff would not comply with the test requirements as he refused to allow Pittman to touch his left arm and refused to perform any activities with his left arm.  (AR 947-48, 954-55.)  Pittman stated she could not determine plaintiff's "true" functional use of his left upper extremity based on her inability to assess the involved body parts.  She wrote that plaintiff's refusal to participate, and his self-limiting activities, made it impossible for her to evaluate his actual lifting capacity.  (AR 956.)

Thereafter, on October 26, 2006, defendant sent plaintiff for an IME by Dr. Mark Diaz, an occupational medicine specialist. Similar to his reports to Pittman, plaintiff reported to Dr. Diaz that his pain level has been 10 out of 10 in his left hand, arm and shoulder since the time of his injury.  (AR 1148.)  Plaintiff stated that his pain does not get better even for a short period of time.  (<u>Id.</u>)  Plaintiff claimed that since he got injured, he has been "pretty much restricted to just walking around his house."  (AR 1150.)  He stated he cannot walk longer than 5 minutes, because every 3 to 5 minutes he gets increased pain in his left arm when he walks.  (AR 1150-51.)  Plaintiff also stated he could not pick up anything in his left arm.  (AR 1151.)  He denied the ability to reach for anything with his left arm.

10

(<u>Id.</u>)  He states that he is not able to sit for a half hour because of irritability due to the pain in his left arm and similarly for standing for a half hour.  (<u>Id.</u>)  Dr. Diaz reported, however, that plaintiff's wife indicated to him that plaintiff "gets in the sauna tub upstairs and gets the jets on him."  (<u>Id.</u>)

During the physical examination, Dr. Diaz asked plaintiff to take a kleenex out of his left pocket.  (AR 1153.)  Plaintiff stated he could not do it, and that he had not been able to do so since the traffic accident.  He also said that he could not grab a kleenex and switch it from his right hand to his left hand.  (<u>Id.</u>)

Dr. Diaz concluded from his review of plaintiff's medical file, the surveillance tape and his physical examination of plaintiff, that plaintiff's complaints of pain were incredible. He found that the surveillance video "seriously undermines" plaintiff's claimed injuries.  He concluded that plaintiff could perform sedentary work and most probably light work.  (AR 1154, 1156.)  Dr. Diaz subsequently revised and amended his initial report, in part; although, he continued to find that plaintiff "is either grossly exaggerating his symptoms or is malingering." (AR 901-21, 899-900, 828-30.)

Defendant also considered in evaluating plaintiff's claim the lack of evidence demonstrating atrophy of the upper left extremity.  A April 2004 radiological study, ordered by Dr. Pai to "rule out atrophy" in light of the fact that plaintiff had a "[i]mmmobile left hand, history of RSD times 14 months" was normal.  (AR 1062.)  Two years later, in his October 26, 2006

report, Dr. Diaz notes that "[t]here was no obvious atrophy in the left upper extremity." (AR 1153.) Defendant found that the absence of atrophy discredited plaintiff's contention that his left arm and hand had been essentially immobile for the last 17 years.

Additionally, in investigating plaintiff's claim, defendant considered that while Dr. Pai had repeatedly and consistently provided his diagnosis for plaintiff--of RSD effecting the left upper extremity with chronic pain syndrome and depression--he failed to state over the years why these impairments precluded him from working in any occupation. Moreover, specifically as to plaintiff's purported depression, defendant found Dr. Pai's opinion unsupportable. As early as March 1994, Dr. Pai conceded that plaintiff has his "own psychiatrist" and that Dr. Pai does not see plaintiff for his psychiatric condition. (AR 1370.) Despite this admission, in the following years, Dr. Pai continued to offer his conclusion that plaintiff was depressed. For example, in August 1996, Dr. Pai describes plaintiff's impairment as a "Class 5," meaning that he "has significant loss of psychological, personal and social adjustment (severe limitations)." (AR 1294.) Similar classifications were provided in 2000, 2003 and 2005, yet Dr. Pai admits he was not seeing plaintiff for his psychiatric condition during this time, and he provided no clinical findings to support these conclusions. (AR 1123, 1009, 1099.) In general, defendant found that there was an absence of any clinical findings in plaintiff's medical records

to support the existence of debilitating depression,[6] and there
were no records to support that plaintiff was receiving treatment
for depression.

In a similar vein, defendant considered the overall lack of
treatment plaintiff received for what he described as a severely
painful, chronic and debilitating physical condition.  According
to plaintiff's claim forms and the various APSs, the only
physician who treated plaintiff for the 17 year period he
received benefits was Dr. Pai.  As early as 1992 and 1993, the
records reveal that plaintiff saw Dr. Pai only "as necessary,"
which over the years averaged to one visit a year.  (AR 1534-35,
1525-26, 1510-11, 1478-79, 1445-46.)  As of October 2000, Dr. Pai
saw plaintiff once every six months.  (AR 1122.)  By 2005 and
2006, plaintiff saw Dr. Pai only "as needed," which again
averaged to visits once a year.  (AR 959-61, 1089, 1097-99.)

Finally, on January 23, 2007, defendant prepared a
Transferrable Skills Analysis ("TSA") for plaintiff, considering
plaintiff's prior work history, his education and Dr. Diaz'
report.  Rehabilitation Specialist Danny Seccums identified three
jobs that he believed plaintiff could perform:  project engineer,
production planner and general supervisor.  (AR 840-43.)

---

[6]    For example, in 1994, Kaiser confirmed that it had no
psychiatric records for plaintiff, and in April 1994, plaintiff
told defendant he was not under the care of a psychiatrist
because the treatment was "useless," despite Dr. Pai representing
to defendant, at the same time, that plaintiff was under such
care.  While many years later, in 2001, Dr. Pai told defendant
plaintiff was taking psychiatric medications prescribed by a
psychiatrist (AR 1119), neither Dr. Pai nor plaintiff ever
identify on the claim forms or APSs the psychiatrist who
prescribed the medication.  Additionally, plaintiff never
provided any records of therapy he received for any psychiatric
condition.

1    Defendant sent Pittman's FCE, Dr. Diaz's IME and the report
2    of the SIU to Dr. Pai in a letter of January 30, 2007, seeking
3    his opinions as to the reports.  (AR 614, 833, 836.)  Dr. Pai
4    responded that he had nothing additional to add to plaintiff's
5    claim.  (AR 614.)

6    **E.   LICNA's Denial of Benefits & Plaintiff's Appeal Thereof**

7    On the basis of the above evidence, set forth in Section D
8    _supra_, LICNA terminated plaintiff's LTD benefits by letter, dated
9    March 5, 2007.  (AR 817-24.)  The letter sets forth the policy's
10   definition of total disability from "any occupation," summarizes
11   the background facts and describes why in light of the FCE by
12   Pittman, Dr. Diaz' report, the TSA and the surveillance of
13   plaintiff, defendant found plaintiff no longer entitled to
14   benefits.  (_Id._)

15   Plaintiff appealed defendant's decision.  (AR 235-609.)  In
16   support, he offered, among other things, a May 1, 2007 office
17   note of Dr. Pai, reiterating his diagnosis of RSD and explaining
18   that plaintiff has had ongoing pain for 16 to 17 years, and that
19   he has "extreme hypersensitivity of the entire left side."  (AR
20   210-11.)  In this office note, Dr. Pai also increases plaintiff's
21   morphine prescription to 5 mg three times daily, but he provides
22   no explanation for why the increase was necessary.  Dr. Pai also
23   submitted on plaintiff's behalf a letter of August 24, 2007,
24   which criticized Dr. Diaz' report and the FCE by Pittman.  Dr.
25   Pai argued that Dr. Diaz' opinions reflect a lack of
26   understanding of RSD and the current literature for the disease,
27   and asserted that Dr. Diaz had no proper basis to disbelieve
28   plaintiff.  (AR 220-22.)  As to Pittman, Dr. Pai asserted her

14

report reflected a lack of understanding between an "inability to perform a task due to pain" and "refusal to perform a task based on an uncooperative stance." (AR 224.)

Plaintiff also submitted a declaration as part of his appeal papers. Therein, plaintiff describes the following: (1) he suffers from constant burning pain; (2) he cannot sleep for more than two to three hours at a time due to pain and is therefore, constantly fatigued; (3) he suffers from poor memory such that he gets confused and forgetful of details; (4) he cannot focus or concentrate on any objective for any significant period of time; (5) he takes three medications daily, morphine sulfate, darvocet and loraxepam, all of which cause fatigue, loss of focus and concentration; (6) his wife helps him with most personal needs; (7) he reads religious materials and prays as much as he can; (8) he does exercises when his pain medications are at their peak; (9) he tries to swing his left shoulder to prohibit atrophy; and (10) he goes for walks daily. More specifically with respect to walking, plaintiff states that he only has some movement of his left arm for one to two hours after he performs physical therapy exercises at home:

> After I complete the exercises; I normally have 1 to 2 hours of better arm movement. This is when I walk and try to swing my left shoulder to prohibit atrophy. . . .
>
> These walks are part of my physical therapy which helps my shoulder from becoming frozen and developing atrophy. Dr. Pai has encouraged me to walk and do whatever I can. . . .
>
> This is why I can walk with some motion, bend my elbow and use my hand and fingers to grab something as simple as a letter as in the surveillance video . . . After one or two hours my shoulder, arm and hand exhibit more pain with movement and cause me to become more sedentary. I am unable to do anything until the next day when I go

15

through the same routine.  This is also the reason I
can't perform any movements as when examined by Dr.
Diaz, but he sees a video surveillance with some movement
achievable and surmises that I could do it all day long
or whenever I wish.  I try to do the physical therapy
exercises two acts a day, but it irritates my condition
and is not physically possible.

(AR 278-81.)

## F.   LICNA's Further Review and Denial of Plaintiff's Appeal

As a result of the additional information plaintiff

submitted in support of his appeal, defendant engaged Dr. Donald

Van Fossan, a board certified neurologist, to conduct a peer

review of plaintiff's medical records prior to April 1, 2007.  In

his report of October 30, 2007, Dr. Van Fossan concluded that

plaintiff's medical condition did not preclude him from working

in any occupation.  (AR 199-201.)  Specifically, as to the two

issues plaintiff emphasized in his appeal, his side effects from

medication and fatigue, Dr. Van Fossan found that the

documentation in plaintiff's file did not support the conclusion

that plaintiff was impaired from working due to side effects of

medication.  (AR 201.)  He also found that no documentation

supported the conclusion that plaintiff was precluded from

working by symptoms of extreme fatigue.  (Id.)  Plaintiff

complains that while Dr. Van Fossan reviewed plaintiff's

underlying medical records, defendant did not provide Dr. Van

Fossan with all of the materials plaintiff submitted on the

appeal, including Dr. Pai's August 2007 letter, plaintiff's

declaration and information regarding plaintiff's SSDI award.

By letter dated November 12, 2007, LINCA denied plaintiff's

appeal, for the reasons stated in the original denial letter and

based on the further findings of Dr. Van Fossan.  (AR 196-98.)

16

1    On January 11, 2008, plaintiff filed suit in this court

2 against defendant under ERISA, seeking reinstatement of his LTD

3 benefits and payment of all past benefits due under the policy

4 with applicable interest. (Compl. at 4; Pl.'s Trial Brief at

5 24.) In February 2009, the parties filed cross-motions for

6 judgment in their favor based on a stipulated administrative

7 record, which the court now considers and renders its decision

8 thereon.

9                              **STANDARD**

10    The policy at issue is a long term disability benefits

11 policy governed by ERISA. In <u>Firestone Tire 7 Rubber Co. v.</u>

12 <u>Bruch</u>, the United States Supreme Court held that a challenge to

13 the denial of benefits under an ERISA plan is reviewed de novo

14 "unless the benefit plan gives the administrator or fiduciary

15 discretionary authority to determine eligibility for benefits or

16 to construe the terms of the plan." 489 U.S. 101, 115 (1989).

17 Where a plan document gives an administrator such discretionary

18 authority, a court must apply the "abuse of discretion" or

19 "arbitrary and capricious" standard of review to the

20 administrator's decision to deny benefits. <u>Id.</u> at 111; <u>see also</u>

21 <u>Abatie v. Alta Health & Life Insur. Co.</u>, 458 F.3d 955, 963 (9th

22 Cir. 2006).

23    In this case, however, the parties agree that no such

24 discretionary provision exists in the policy and thus the de novo

25 standard of review applies. (Def.'s Trial Brief at 20; Pl.'s

26 Trial Brief at 14.) Under de novo review, the court determines

27 whether the plaintiff is entitled to benefits under the terms of

28 the policy without deference to either party's interpretation.

<u>Firestone Tire & Rubber Co.</u>, 489 US at 112.   "If de novo review
applies, no further preliminary analytical steps are required.
The court simply proceeds to evaluate whether the plan
administrator correctly or incorrectly denied benefits . . . ."
<u>Abatie</u>, 458 F.3d at 963.   Pursuant to Federal Rule of Civil
Procedure 52(a), the court conducts what is essentially a bench
trial on the administrative record.   <u>Kearney v. Standard Ins.</u>
<u>Co.</u>, 175 F.3d 1084, 1094-95 (9th Cir. 1999).   Thereunder, the
court must undertake an independent and thorough inspection of
LICNA's decision and exercise its informed judgment without
reference to that decision.   <u>Silver v. Executive Car Leasing Long</u>
<u>Term Disability Plan</u>, 466 F.3d 724, 733 (9th Cir. 2006).   The
court gives no deference to either LICNA's factual findings or
its legal conclusions.   <u>Walker v. American Home Shield Long Term</u>
<u>Disability Plan</u>, 180 F.3d 1065, 1068-70 (9th Cir. 1999).

Ultimately, under a de novo standard of review, the
plaintiff has the burden of proving his or her eligibility for
benefits under the terms of the policy by a preponderance of the
evidence.[7]   <u>Sabatino v. Liberty Life Assurance Co. of Boston</u>, 286
F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) ("Plaintiff must carry
the burden to prove that she was disabled under the meaning of
the plan . . . .").   Thus, here, plaintiff must prove, it is more
likely than not, that he is totally disabled under the "any

---

[7]     Pursuant to the Ninth Circuit jury instructions, "When
a party has the burden of proof on any claim . . . by a
preponderance of the evidence, it means [that the factfinder]
must be persuaded by the evidence that the claim . . . is more
probably true than not true."   9th Cir. Jury Instr. § 1.3.   This
decision should be based "on all of the evidence, regardless of
which party presented it."   <u>Id.</u>

occupation" standard set forth in the policy.[8]

## ANALYSIS

Plaintiff filed this action to recover benefits under Tandem's employer-provided LTD policy, which is administered by LICNA.   Pursuant to section 502(a) of ERISA, which governs such policies, the beneficiary of an ERISA plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."   29 U.S.C. § 1332(a)(1)(B); see also Taft v. The Equitable Life Assurance Soc'y, 9 F.3d 1469, 1471 (9th Cir. 1993). Plaintiff asserts that LICNA erred in terminating his benefits after payment of the same for 17 years; he seeks prospective reinstatement of his benefits and payment of all past benefits due since March 2007, with applicable interest.   Defendant contends that under its continuing right to review plaintiff's claim for benefits, it properly terminated his benefits in light of the current evidence which demonstrated that plaintiff was no longer totally disabled within the terms of the policy.

---

[8]   The court has wholly disregarded plaintiff's arguments concerning defendant's alleged economic, conflict of interest in rendering its claims decision.   Under de novo review, "no further preliminary analytical steps are required.   The court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, *without reference to whether the administrator operated under a conflict of interest*."   Abatie, 458 F.3d at 963.   Thus, plaintiff's various arguments based on alleged improper claims handling by defendant are irrelevant to the inquiry.   See Metropolitian Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2351-52 (2008) (requiring only in the context of "abuse of discretion" review, consideration of a combination of factors impacting the claims decision, including the presence of any conflict of interest by the plan administrator).   Relevant to this court's de novo review is simply the administrative record, documenting plaintiff's medical condition and ability to work.

1    More specifically, defendant contends that plaintiff's

2 claimed, continued disability was based wholly on subjective

3 complaints of chronic pain and hypersensitivity which were not

4 credible in light of the surveillance performed on plaintiff,

5 plaintiff's refusal to cooperate in an FCE and the findings of

6 the IME by Dr. Diaz.  Defendant also maintains that Dr. Pai's

7 opinions lack credibility in light of this evidence.

8 Furthermore, defendant asserts that even if the court found that

9 plaintiff can demonstrate that he suffers from a chronic disease,

10 he cannot establish that the diagnosis renders him disabled from

11 performing "any occupation," which under the controlling case law

12 presents a high threshold.  Defendant argues there is no evidence

13 in the administrative record to establish why plaintiff cannot

14 perform his intellectually driven occupation as an engineer, even

15 if the court accepts the evidence of his claimed impairment as

16 credible.

17    The court finds for the reasons set forth below that

18 plaintiff has not demonstrated, by a preponderance of the

19 evidence, that he is totally disabled within the terms of the

20 subject policy.  Plaintiff's claims of a disabling disease lack

21 credibility and the objective record evidence does not support

22 his claims.  Moreover, even if the court were to find plaintiff's

23 claim of a debilitating disease credible, plaintiff has not shown

24 that it is more likely true than not, that he cannot perform all

25 the material duties of any occupation for which is qualified or

26 could become qualified.

27    Before addressing these issues in turn, the court must

28 consider first, plaintiff's preliminary argument that defendant

20

should be judicially estopped from asserting that plaintiff is not disabled under the policy due to defendant's representation of plaintiff in the SSA proceedings.  Contrary to plaintiff's contentions, the fact that defendant assisted plaintiff in obtaining SSDI benefits in 1994 does not preclude defendant from arguing that plaintiff is not disabled 13 years later based on evidence that did not exist in 1994.  The equitable doctrine of judicial estoppel precludes a party from taking inconsistent factual positions in judicial proceedings.  See New Hampshire v. Maine, 532 U.S. 742 (2000) (holding that the plaintiff was equitably barred from asserting, contrary to its position in prior 1970's litigation, that the inland Piscataqua River boundary runs along the Maine shore).  The doctrine is wholly inapplicable here.

First, *plaintiff* took the position in the 1994 SSA proceedings that he was disabled, not defendant, and thus, plaintiff cannot establish an inconsistent position by defendant, even assuming the SSA proceedings constitute "judicial" proceedings.  Second, plaintiff's position in 1994 that he was disabled is not inconsistent with defendant's position that plaintiff is not disabled 13 years later, in March 2007.  The subject policy requires plaintiff to provide on-going proof of disability.  (AR 23.)  Defendant is entitled to investigate this proof of loss and make a monthly decision concerning whether benefits are payable based on the proof of loss.  Erreca v. Western States Life Ins. Co. 19 Cal. 2d 388, 402 (1942) (holding that a disability insurance policy "constitutes a continuing contract for periodic installment payments depending upon the

insured's continued disability" and that an "insurer's liability
for future benefits is contingent upon the existence of total
disability at the time").  Thus, the fact that defendant assisted
plaintiff in obtaining SSDI benefits in 1994 has no impact on
defendant's right to investigate the continued proof of loss by
plaintiff, and to make the ultimate determination that the proof
does not establish the existence of a disability, under the any
occupation standard, 13 years after SSDI benefits were awarded.
Indeed, most of the evidence relied on by defendant to conclude
in 2007 that plaintiff is not disabled under the policy did not
exist in 1994, including the video surveillance, Pittman's FCE,
Dr. Diaz's IME and the TSA, and therefore, there is no
conflicting position at issue.

Finally, plaintiff's general emphasis on his SSDI award as
conclusive proof of his continued disability is not persuasive.
Courts consistently recognize that there are critical legal
differences between disability determinations made in SSA
proceedings and ERISA actions.  <u>Black & Decker Disability Plan v.
Nord</u>, 538 U.S. 822, 832-33 (2003) (holding that "critical
differences between the Social Security disability program and
ERISA benefit plans caution against importing a treating
physician rule from the former area into the latter"); <u>Madden v.
ITT Long Term Disability Plan for Salaried Employees</u>, 914 F.2d
1279, 1285 (9th Cir. 1990) (upholding a denial of long-term
benefits under the "any occupation" standard even when social
security disability benefits had been awarded).  Additionally,
and most significantly, as set forth above, plaintiff was awarded
SSDI benefits on January 31, 1994; the primary evidence defendant

considered in deciding to terminate plaintiff's LTD benefits was
obtained over ten years later in 2005 through 2007.  As such, for
these further reasons, plaintiff's SSDI award has little, if any,
relevance to these proceedings.

Turning to the critical inquiry, whether plaintiff has
demonstrated he is totally disabled within the terms of the
policy, the court must start its analysis by looking at the
"terms of the plan itself."  Nelson v. EG & G Energy Measurements
Group, Inc., 37 F.3d 1384, 1389 (9th Cir. 1994).  Here, plaintiff
faces a high burden to establish disability.  Saffle v. Sierra
Pacific Power Co. Bargaining Unit Long Term Disability Income
Plan, 85 F.3d 455, 459 (9th Cir. 1996).  The policy requires that
to be entitled to LTD benefits, plaintiff must show he is "unable
to perform all the material duties of any occupation for which he
is or may reasonably become qualified based on his education,
training, and experience."  (AR 5.)  The Ninth Circuit has
recognized that this is a difficult standard to meet, as it
requires a plaintiff to show that he cannot perform *every*
material duty of *any* occupation for which is qualified or may
reasonably become qualified based on his education and
experience.  McKenzie v. Gen. Tel. Co. of Cal., 41 F.3d 1310,
1317 (9th Cir. 1994); see also Ellis v. Liberty Life Assur. Co.
of Boston, 394 F.3d 262, 270 (5th Cir. 2005).  Here, defendant's
TSA concluded that plaintiff could perform the jobs of project
engineer, production planner or general supervisor.  (AR 840-43.)

Plaintiff maintains, to the contrary, that he is totally
disabled from performing any occupation due to his RSD, which he
has suffered from since 1990.  Plaintiff contends he suffers from

23

chronic, unrelenting pain in his upper left extremity due to the
RSD, and that his condition is compounded by the narcotic
medications he takes to mitigate the pain; as a result of his
condition and, particularly, the medications, plaintiff claims a
complete inability to focus and concentrate and extreme fatigue.

However, plaintiff's claims, and his doctor's findings based
entirely thereon,[9] are not sufficiently credible in light of the
evidence in the administrative record.  The multiple
contradictions established by the evidence in the record make it
impossible for plaintiff to meet his burden of proof in this
case.

For example, plaintiff's complaints of severe pain are
seriously undermined by the surveillance tape.  Contrary to
plaintiff's claims from 2003 to 2005, on his daily activity
questionnaires to defendant, that he only walks daily "around the
house" for 10 to 15 minutes, plaintiff is seen on the tape
walking outside his home, in a rural area, for extended periods
of up to an hour and a half, traveling approximate distances of
up to 5 miles.  He has free range of motion and does not appear
to be favoring his left side in any respect.  Plaintiff's
activity on the tape is wholly inconsistent with his
representations to defendant and to Pittman during the FCE.  Like
his previous statements to defendant, plaintiff told Pittman he
was only able to walk around his house for limited periods (AR
944), and he stopped the six minute walk test Pittman gave him

---

[9]      See Jordan v. Northrup Grumman Co. v. Welfare Benefit
Plan, 370 F.3d 869, 878 (9th Cir. 2004) (recognizing that a plan
administrator may properly reject physicians' diagnoses that rely
solely on the patient's subject reports of pain).

after 3 minutes, indicating he could not go any longer (AR 950-51, 954-55).   Indeed, plaintiff consistently claimed to defendant and his doctor, that the pain on his left side is so severe that even air blowing over his left arm and hand caused him a very uncomfortable sensation, and that his left hand could not be moved or even straightened.   (AR 1030.)   He made similar complaints to Pittman (AR 944, 1236), yet, on November 7, 2005, plaintiff is seen walking on the video, on a clearly windy day, freely swinging his left arm and hand as he walked alone for over a hour.   Additionally, that same day, plaintiff is observed, voluntarily and without hesitation, using his left hand and arm to open a garbage can lid.[10]

Plaintiff is also seen using his left hand to reach into his front shirt pocket.   Again, his movement is voluntary and without hesitation.   This is directly contrary to the representation he made to Dr. Diaz, just months later during the IME, specifically denying the ability to perform this precise task.   Dr. Diaz asked plaintiff to take a kleenex out of his left pocket, and contrary to what is seen on the video, plaintiff stated he could not do it, and that he had not been able to do so since the traffic

---

[10]   This evidence also calls into question Dr. Pai's opinions during this time frame.   In an August 2005 APS (AR 1097-99) and a June 2006 APS (AR 959), Dr. Pai concludes that plaintiff is permanently disabled based on his RSD, which he classifies as a "Class 5" physical impairment that has recently "retrogressed," meaning plaintiff is so impaired that he has "severe limitations of functional capacity" and is "incapable of [even] minimal (sedentary) activity." Yet, plaintiff is seen on the surveillance video walking for extended periods of time, swinging and moving both arms and lifting a garbage can lid with his left arm and hand.

accident.   (AR 1153.)[11]

    In response to this evidence, plaintiff emphasizes his
declaration submitted in support of his appeal, wherein he
explains that he walks daily after performing certain physical
therapy exercises which permit him, for limited periods of time,
to perform some physical activity, like the level of walking
shown on the surveillance tape.  Plaintiff's declaration is not
persuasive evidence in support of his claims; it was drafted
*after* plaintiff knew of the surveillance and it is inconsistent
with his prior representations about his level of physical
activity.  At no point previously did plaintiff disclose that he
could walk to the levels seen on the videotape.   Indeed, he
consistently claimed that he could only walk up to 10 to 15
minutes daily and that he walked "around [inside] the house."  He
never reported to defendant that he walked around his
neighborhood, on trails, as part of his physical therapy or
otherwise.  Nor did he report that his physical therapy exercises
permitted him to engage in physical activity for up to 2 hours
where he was able to move his left arm and shoulder freely.

    Finally, contrary to plaintiff's representations to
defendant, he is seen on the surveillance tape driving his wife
to the gas station, on what appears to be a simple errand, not an
emergency situation.

    In addition to the surveillance tape, the record reveals
other significant contradictions.  Plaintiff claimed to Dr. Diaz

_____

    [11]   Plaintiff does not deny that he made these statements
to Dr. Diaz in either his declaration submitted in support of his
appeal or in his papers submitted to this court.

that he could not sit for more than a half hour, yet Pittman
reported that plaintiff sat, without complaint, for the 60 minute
drive to her office for the appointment and for 66 minutes during
the FCE.  (AR 950, 954.)  Additionally, plaintiff's wife told Dr.
Diaz that plaintiff gets in the sauna tub at home and lets the
jets run on him (AR 1151); this flatly contradicts plaintiff's
statements to Pittman that he cannot take a shower because he
cannot tolerate the water hitting his left arm (AR 944).
Plaintiff does not deny that he and his wife made these
statements to Dr. Diaz in either his declaration submitted in
support of his appeal or in the papers filed in this court.

Furthermore, there is a general lack of objective evidence
in the record to support plaintiff's continuing complaints of
pain.  Over the course of the nearly 17 years he received LTD
benefits from defendant, plaintiff saw only one primary doctor,
Dr. Pai, and he saw him on average only once a year.  Considering
the alleged severity of plaintiff's claimed aliments, the lack of
treatment he received is telling.  In other words, the frequency
and extent of the treatment plaintiff received, as reflected in
the administrative record, does not match the severity of
plaintiff's alleged symptoms.  For example, plaintiff claims that
his chronic pain from RSD has caused him to suffer debilitating
cognitive problems and sleep deprivation.  Yet, nothing in
plaintiff's records reveal any efforts by physicians to find
medications or any other ways to resolve these issues; there are
no referrals by Dr. Pai to sleep specialists or a pain management
specialist to attempt to resolve these problems.  As such,
plaintiff cannot persuasively argue that these specific symptoms

1   were so severe as to prevent him from working in any capacity.

2   Relating to his physical condition, it is particularly

3   significant that there is no evidence in the record demonstrating

4   that plaintiff suffers from atrophy of his left upper extremity.

5   The absence of atrophy discredits plaintiff's contention that his

6   left arm and hand have been largely immobile for the last 17

7   years.  Finally, plaintiff stressed in his appeal the amount of

8   pain medications he takes to mitigate his symptoms.

9   Specifically, plaintiff emphasized that in May 2007, Dr. Pai

10  increased his morphine prescription.  However, Dr. Pai in his May

11  1, 2007 doctor's note did not indicate a basis for doing so (AR

12  210); Dr. Pai did not indicate that plaintiff's alleged condition

13  had changed, and there is nothing in the records to otherwise

14  support an increase in plaintiff's medications.  Moreover, that

15  the increase was given, without explanation, during the course of

16  plaintiff's appeal of the termination of his benefits makes it

17  suspect and certainly does not conclusively establish the

18  existence of a disability, as plaintiff contends.

19  Furthermore, relating to plaintiff's mental condition, while

20  plaintiff claims to suffer from depression due to his RSD, there

21  are no records to substantiate a clinical finding of depression;

22  Dr. Pai did not treat plaintiff for depression, and there are no

23  records to substantiate that plaintiff received any psychiatric

24  treatment for depression.  Similarly, plaintiff's claims of a

25  complete inability to focus and concentrate and extreme fatigue

26  due to his condition, and more specifically, the pain medications

27  he takes, are not supported by any objective evidence in the

28  record.  Indeed, it was only during the course of his appeal of

28

defendant's termination of his benefits, that plaintiff emphasized these purported debilitating effects of his disease. After reviewing plaintiff's past medical history and records, however, Dr. Van Fossan found plaintiff's claims unsupported. (AR 201.)[12]  The absence of evidence to establish a disability based on the side effects of his medications is most glaringly illustrated by the fact that plaintiff cites to only his declaration submitted on the appeal as *evidence* to support his claims.  This is all the record evidence plaintiff has, as in Dr. Pai's various reports over the years, he does not mention anything about the side effects of plaintiff's medications, let alone that plaintiff's medications are having debilitating effects.

In sum, the court finds that plaintiff cannot establish, by a preponderance of the evidence, that he is totally disabled from any occupation because his claimed disability is based primarily on his subjective complaints of chronic pain, cognitive problems and sleep deprivation which are not credible in light of the totality of the record evidence.  The surveillance conducted by defendant, the FCE by Pittman and the IME by Dr. Diaz provide compelling evidence that plaintiff is misstating or overstating his subjective complaints.

---

[12]    Plaintiff criticizes Dr. Van Fossan's findings on the grounds he was not provided and thus did not consider plaintiff's appeal materials, including plaintiff's declaration and Dr. Pai's analysis of Dr. Diaz' IME.  Plaintiff's criticism misses the mark.  Dr. Van Fossan was asked to do a peer review of plaintiff's file prior to April 2007, when defendant terminated plaintiff's benefits, to determine whether the denial was merited.  Materials obtained by defendant after April 2007 were not pertinent to Dr. Van Fossan's specific inquiry.

1    Notwithstanding this finding, the court further concludes
2    that even if plaintiff's claims were credible, plaintiff has not
3    shown why the RSD in his upper left extremity precludes him from
4    performing in his intellectually driven occupation as an
5    engineer.   The Ninth Circuit has recognized repeatedly that
6    simply because "a person has a true medical diagnosis . . . does
7    not by itself establish disability."   Jordan v. Northrop Grumman
8    Corp. Welfare Benefit Plan (Jordan II), 370 F.3d 869, 880 (9th
9    Cir. 2004) (upholding the denial of the plaintiff's benefits
10   claim not because plaintiff failed to demonstrate the existence
11   of a medical condition [fibromyalgia] but because the plaintiff
12   was unable to prove that her physical disability kept her from
13   performing her job).

14       Here, plaintiff is an electrical engineer with training in
15   the Navy and 10 years of industry experience.   He is right hand
16   dominant, and it is undisputed that plaintiff's claimed
17   impairment is to his left upper extremity only.   Plaintiff's job
18   description from Tandem and the TSA by defendant establish that
19   plaintiff's job duties as an engineer are performed by his
20   intellect and have little or no physical requirements.   The TSA
21   identified three potential jobs for plaintiff: project engineer,
22   production planner and general supervisor.   Plaintiff points to
23   no evidence in the administrative record that establishes *why*
24   plaintiff cannot use his mind and his right and lower extremities
25   to perform these jobs.   Plaintiff's sole reliance on Dr. Pai's
26   opinions is unavailing.   Throughout his many reports on
27   plaintiff's condition over the years, while Dr. Pai makes
28   detailed findings with respect to his diagnosis of plaintiff's

RSD condition, his reports are devoid of any specific discussion
of why plaintiff's condition precludes him from performing at any
occupation.  <u>See e.g.</u>, <u>Mitchell v. Aetna Life Insur. Co.</u>, 359 F.
Supp. 2d 880, 890 (C.D. Cal. 2005) (granting summary judgment in
favor of the defendants on the grounds the plan administrator did
not abuse its discretion in denying the employee's LTD benefits
claim based on the employee's "subjective reports of pain and her
doctors' unexplained conclusory opinions that she was disabled
from performing any job").

      In fact, it was not until his August 24, 2007 letter to
defendant, submitted in support of plaintiff's appeal, that Dr.
Pai attempts to set forth in any detail his basis for believing
that plaintiff cannot work in any capacity.  Dr. Pai's belated
opinions cannot be given substantial weight.  Prior to defendant
terminating plaintiff's benefits, it sought Dr. Pai's opinions in
January 2007, providing him with the SIU investigation, Pittman's
FCE and Dr. Diaz' IME.  Dr. Pai responded that he had nothing
additional to add to plaintiff's claim.  It was only *after*
defendant's termination of benefits and as part of plaintiff's
appeal, that Dr. Pai saw fit to critique and disagree with
Pittman's and Dr. Diaz' findings.  Dr. Pai's untimely criticism
is unpersuasive.

      Plaintiff's limitations to his upper left extremity, even
assuming they are true, would not impede his ability to perform
at jobs requiring primarily use of plaintiff's intellect.
Additionally, as set forth above, plaintiff has not established
any mental impairment as a result of the RSD to his left side.
The record does not support a finding that plaintiff suffers from

1 depression which precludes him from working, and likewise, there

2 are no records to support a finding that plaintiff suffers from

3 extreme fatigue or other mental side effects from his pain

4 medications to such a degree that he is precluded from performing

5 at any occupation.  There is simply no objective medical evidence

6 of any memory or concentration deficits beyond plaintiff's own

7 subjective complaints--complaints which were largely raised for

8 the first time only during the appeal of defendant's termination

9 of plaintiff's benefits.

10     As such, for these alternative reasons, the court finds that

11 plaintiff has not shown by a preponderance of the evidence, that

12 he is totally disabled from working at any occupation for which

13 is qualified or could become qualified based on his education and

14 experience as an engineer.  There is no credible evidence in the

15 administrative record that establishes why plaintiff is unable to

16 work in any occupation in light of the fact that he has no

17 documented mental impairment that prevents him from working and

18 he has unlimited physical capacity on his right side and lower

19 extremities.  Plaintiff's current medical records support a

20 finding that plaintiff is capable of working in a sedentary to

21 light work capacity in his intellectually driven field of

22 engineering.

23                              **CONCLUSION**

24     For the foregoing reasons, the court GRANTS defendant's

25 motion for judgment on the administrative record and HEREBY

26 enters judgment in defendant's favor.  Accordingly, plaintiff's

27 cross-motion for judgment in his favor is DENIED.  The Clerk of

28

1   the Court is directed to close this file.

2        IT IS SO ORDERED

3   DATED: June 5, 2009

5                                              _____
6                                              FRANK C. DAMRELL, JR.
                                               UNITED STATES DISTRICT JUDGE